that you're all ready for a full menu of tightly argued cases and tiny details. So please follow our rules, or at least try to, which is that the yellow light will come on and give you two more minutes, and when the red light signals, we ask you to complete your comments unless the court has asked you a question. We have clearly not been able to read the entire record in several of these complex cases, so we appreciate record citations when those are available. And that's all I can think of right now, so we'll call the first case, number 24-20207, Sanchez Energy Corporation, Carnero G&P v. Maverick et al. We'll hear from Mr. Wolfshall. Thank you, Your Honors. May it please the Court. Joshua Wolfshall on behalf of Carnero G&P LLC, the appellant in this case. Your Honors, my client is asking this Court to reverse the lower court's adjudication of my client's state law claims that arose 18 months after confirmation of the debtors'  Can you use the volume? It's kind of low. Is there any way at least you need to speak into it? Is that a little bit better, Your Honor? That's helpful. I apologize. My client is asking this Court to reverse the lower court's adjudication of my client's state law claims that arose 18 months after confirmation of the debtors' reorganization plan. The appellant believes that the bankruptcy court's judgment extended far beyond the limits of bankruptcy court jurisdiction, that it deprived my client of state law remedies against non-debtors, and that it allowed the reorganized debtors and five non-debtors to cleanse their post-confirmation breaches by characterizing them as being effective as of the date of  confirmation. Now, Your Honors, I'm going to ask that the Court focus on four key principles under the plan and the bankruptcy code that we don't believe the appellees can escape. The first is that non-debtor contracts are not executory contracts, not under this plan and not under the bankruptcy code. The second is that contracts that didn't exist as of confirmation cannot be executory contracts. Cannot be. Say that again. Executory contracts, Your Honor. Not under this plan and not under the bankruptcy code. And third, this plan could not and did not bar claims against non-debtors. As this Court is well aware, bankruptcy law is not intended to protect non-debtors, and that's consistent with this Court's recent opinion in the Highland Capital case, as well as the Supreme Court's Purdue Pharma decision last year. And the fourth is that protections provided to reorganized debtors is not infinite, and it cannot extend to post-confirmation transactions that have nothing to do with the implementation and the execution of a Chapter 11 plan. Your Honors, Carnero is not challenging the plan itself. What we are challenging is the lower court's interpretation of the plan. As we interpret the plan, there is no way that it bars my client's claims. And because it doesn't bar my client's claims, my client had no obligation to object to the rose 18 months after confirmation. And absent being barred by the plan, Your Honors, there is no other bankruptcy jurisdictional link to these cases or to this case, and therefore we believe that the bankruptcy court should have remanded or abstained from hearing this case. Your Honor, I'm going to focus primarily today about jurisdiction. I don't—well, at some point, yeah, jurisdiction is good, but why did the—their argument is that you agreed to a plan provision that said they would attempt to reject many of the agreements, and I don't see that there was an alternative if they didn't, but supposedly they weren't able to reject the agreements, and therefore, as a matter of necessity, they had to go into a Plan B, literally. That's correct. All right. So why isn't that an extension of the plan for all practical purposes? Because Your Honor, I think it glosses over what really happened. So the plan provides that they had the ability on a post-confirmation basis to designate assumption or rejection of executory contracts, and the plan defines executory contracts, and I want to make it very clear that the complaint that we have on file is not complaining about anything under an existing executory contract that got assumed, and we're not complaining about the fact that they did it post-confirmation. Those are the mechanisms set up in the plan, but I think that the court has to read the record closely and read the plan to understand what they are doing, and look, the lower courts did it too. They're glossing over a transaction and calling it sort of a restructuring that somehow relates back to the plan. The plan says nothing about the concept of the entry into new agreements or a settlement agreement like the MSA. What was contemplated, I mean, to, you know, for the sake of argument, what was contemplated by this initial fact that Carnaro supported the idea they would try to reject, in other words, that necessarily implies that there was something too costly in the original agreements that had to be reduced for the debtor to remain, you know, think it remained viable, right? That's correct, Your Honor. But the alternative to them doing what they did under the plan initially, or at least in connection with the effective date of the plan, which was the deal with my client, was that they could assume the executory contracts, but they did much more than that. So that's the distinction I'm trying to make, Your Honor. Well, they said that these new, I understand that quite well, but they said that these new contracts were restructuring and lowering the costs of these additional, of these pre-existing agreements. Is that correct or not correct? That's correct, Your Honor. It did lower the costs? It did lower the costs. Okay. But my client's contention, yeah, contention, is that that was a post-confirmation act. The debtors had emerged from bankruptcy. The only tie to the plan in the bankruptcy case was the fact that they were utilizing the assumption and rejection mechanisms under the plan that would have allowed them, if they desired, to force the counterparties to accept that they were assuming an executory contract. But the debtors were operating. They were out of bankruptcy. They were utilizing one mechanism to help negotiate over these executory contracts. But the agreements themselves, the MSA that we complain about, it was not enshrined in the plan. It wasn't noted in the plan. If the court looks at the conditions preceding to confirmation or, excuse me, to the effective date of the plan, which is substantial consummation, there is nothing. There's seven things listed. There's nothing that says anything about we have to get a deal with our midstream providers. We have to have this settlement that isn't in existence yet. So there's nothing that puts any party on notice that that's something that is required in order for the plan to go effective. And in fact— How about the disclosure statement? The disclosure statement, I've reviewed it. It's been a while, Your Honor. I don't think that the disclosure statement discloses anything about it. And so what you have is a post-confirmation reorganized debtor that is operating its business, that has really almost no court oversight. Really the only thing that they were using the court for was to litigate over the assumption and rejection issue. Those were adversaries in which my client was not a party. And so the bankruptcy court was overseeing that process, but the bankruptcy court was not overseeing the debtor's exercise of its business operations. In fact, if you look at the transcript of the hearing when they came before the court on less than two hours' notice to ask the court to enter an agreed stipulation between the parties, they said, look, Judge, we don't need authority for this. The plan gives us the authority to do this stuff post-confirmation. Are you saying that was the December 21 hearing? That's correct, Your Honor. So I think that the court, in analyzing this, has to kind of pull apart the way that the discussion of this glosses over and refers to this as a capitalized, defined term, midstream restructuring. There's no reference to a midstream restructuring in the plan whatsoever. And so while the debtors did actually effectuate some assumptions of executory contracts, that is not what my client's claims are based on. My client's claims are based on new contracts that got entered into and modifications that don't constitute an assumption under 365, not under the plan and not under the bankruptcy code. And I believe that the plan, in the way that it defines executory contracts, refers back to what an executory contract is under the bankruptcy code.  Now, but, you know, if it's not in the plan, then the court had neither core nor related to, no, it could have related to jurisdiction. It could have related to jurisdiction, but I don't believe in this case it does because we're talking about post-confirmation, which is this court is aware that the related to jurisdiction begins to wane and eventually goes away. And so we don't believe that there's related to jurisdiction, but we also, importantly, if the court does determine that somehow there is related to jurisdiction, which we don't think, and I can get into the description of this case versus Genon. I think that they are, there's an enormous difference between them, and this court has stated that the Genon decision lives at the limits of post-bankruptcy jurisdiction. But even if there is jurisdiction, I think, going to your point . . . How come you didn't cite the opinion that I wrote in Chesapeake Energy? I did not realize that I didn't cite that, Your Honor, but I do believe it's an important . . . Neither party cited it, because who would have dealt with post-confirmation jurisdiction? We did cite Craig Storrs, which I believe, Your Honor, was . . . That was a long time ago. Chesapeake was like a year ago. That's correct, Your Honor. But I think part of why we focus so much on Genon, Your Honor, is that Genon is the . . . Extreme. Extreme, right. And the point that we were trying to make in focusing on Genon is to say, look, if this is at the limits, we're a mile away from the limits. We're way past the limits. And look, Your Honor, I think that the only way that there is a jurisdictional tie is if this Court determines that the Bankruptcy Court and the District Court were right about the plan barring our claims. And there are a number of reasons why that is problematic. For one, Carnaro's claims against the non-debtor Applees, there's five of them, could not possibly be barred by the plan. There wasn't an assumption by those parties of my client's ratification agreement. That's what makes them bound by the GGPA. They weren't debtors. They can't exercise 365 assumption rights. Additionally, as to . . . and my client has independent claims against them. Additionally, as to the December 2021 MSA transaction, while the debtors tried to characterize that as an assumption and backdate it to the confirmation date, and we have a number of reasons why we think that's not accurate or correct, that certainly couldn't happen with respect to non-debtors, Your Honors. Because non-debtors don't have the ability to exercise 365 rights. And so the logic that the lower courts use where they try to treat the assumption of my client's contracts and this MSA transaction that happened 18 months after confirmation as being simultaneous, it falls apart for sure as to non-debtors. Because there is no assumption event as to the non-debtors. There are a lot of points, and I tried to go through some of these contractual issues that you were raising, and it was very difficult. And what I'm wondering is, in many instances, the debtor is claiming or the non-parties are claiming that they're not really harming your client's interests. And therefore, I would appreciate it if you — and they had certain textual references and so on. So I haven't been able to plumb this completely myself. Just how is your client being hurt by these restructuring agreements? First off, Your Honor, I'd ask that we not refer to them as restructuring agreements because I don't believe that they're part of the restructuring. I believe that they're post-confirmation transactions. But there are a number of ways that they are harming my client, Your Honor. First off, in connection with a number of the — first off, as to the executory contracts that existed on the confirmation date, we were fully aware at the time of confirmation that if those stayed in place, that there was a period of time before gas could flow to my client. One of the ways that they modified those agreements was that they provided for certain extensions that would have pushed those dates out further. Another way that they did, Your Honor, is that for some of them, they were set to expire shortly after confirmation, at least a couple years after confirmation. In certain instances, they provided what we — they implemented what we believed was a blocking scheme that prevented us from being able to take gas. Well, I see almost every one of those, they say you're interpreting it wrong and it — and the provisions stand favorable to you or with no change. And so I'm just wondering, are those — those would be considered judicial admissions. They're all over the record. They were basically accepted, I think, by Judge Isker. So what's the problem? Well, so, Your Honor, I don't think they're judicial admissions because my client didn't agree with that premise. We believe that they did affect us. The only thing — the thing we're not complaining about is what was in place as of the petition date, because I recognize that the debtors had the ability to assume contracts and that if they chose to assume those contracts, I had to live with them. So our contention, Your Honor, is that they absolutely did affect us, and so I don't believe that they are a judicial admission. It is true that Judge Isker ruled against us, but as a threshold matter, Judge Isker did not have jurisdiction, and we wanted a state court judge where we filed the case to be the one that adjudicated those claims. So we don't — But this case — I'm sorry. I mean, this is off the wall. Would this case go into the Texas Business Court? That's a — that's a good question, Your Honor. I don't know if the Texas Business Court existed at the time we filed it, but I think it probably would. You know, I'd have to — I'd have to investigate that, but I actually think that that's probably — Well, that — well, one of the thresholds is the amount of money in question. It would definitely meet that criteria, Your Honor. Okay. Thank you. And I see my time is up, and I'll reserve the rest of my argument for rebuttal. Thank you, Your Honors. Thank you. Good morning, Your Honors. Mark Stansel for the Reorganized Debtors Appellees, and unless the Court has specific questions for the other appellees, I'll be presenting argument for everybody today. So you're representing the debtors but not the non-debtors? Yes, Your Honor, but we've agreed that unless the Court has a question specific that I can't answer on behalf of what we call the WIPs, the Working Interest Parties, that I'll be presenting argument. So I think it would be helpful, if I may, to explain where we — why we have the admittedly unorthodox feature of this plan that allows for significant — Many plans that came before Judge Jones ended up with unorthodox features. I certainly take no position on that, Your Honor. Let me tell you what was going on here in the spring of 2020. The company was in a catch-22. It could not even afford to stay in bankruptcy court. The fee burn was killing it. This was during the time when oil briefly had a negative value, and so they couldn't afford to stay in bankruptcy, but they also needed to restructure the cost of their midstream processing agreements. But they couldn't stay long enough in bankruptcy to fight the primary midstream and fight that rejection fight. So this plan offered a way out of that catch-22, and that said, let's postpone until after confirmation and the effective date the major assumption-rejection fight, and I do want to — come — How much of the — of the producing capacity or interests of Sanchez, then Mesquite, did this agreement — did this series of agreements involve? All of the Comanche assets. I believe there were other assets in a different field called Caterina, if I remember correctly. What are the HHK leases, do you know? No, Your Honor. Well, I'm familiar with those from another Sanchez case. Yes, Your Honor. I represent here only the company, and my sole company had on that other case the company has no position. I see. So, Your Honor, that case goes to who owns the company, and the company doesn't have a view on who owns it. So what did they do to get out of bankruptcy? Carnero entered into a deal. Carnero was admittedly the backup midstream provider. It would become the midstream provider under its contract only when the primary commitments expired. So Carnero and the debtors cut a deal. Carnero funded the bankruptcy litigation to reject the primary midstream agreements. That let the plan go effective. They paid their admin claims, and then they set about to fight the primary midstream rejection. What was — why did the rejection fail? Judge Isger ultimately entered a ruling having to do with our favorite topic, covenants running with the land, that made it very clear that it was going to be impossible to — even if they were rejectable, the primary midstream agreements, it would not necessarily result in their rejection, if I remember correctly. You mean you couldn't — you couldn't divorce — you couldn't divorce them from their covenants with the land? Correct. Okay. Interesting. So they did, though — it did have an important benefit, because in the — they were obligated by the debtors to try to reject for some period of months. They ended up going at it for the better part of a year. And after Judge Isger's writing was on the wall, they said, well, it's not going to work. Now we need to renegotiate the primary midstream commitments, and under the deal with Carnero, they gave the money back they were required to go — to give, and they went around — went back to renegotiating their deals. And let me just — the deal with the primary midstream to get new terms. So that's why we have this unusual dynamic and time. But here's an important fact, I think, that is largely missing from Appellant's position. They bargained for that option, and they bargained for these terms in the plan, because it gave them a bite at the apple to try to become the primary midstream provider. It didn't work, but these features of the plan that they're now trying to run from are the very ones that were necessary to make this experiment work. So the first thing that we didn't hear anything about, I believe, in their presentation is the express term of the plan that says that assumptions all occur — are deemed to occur as of the effective date, regardless of whether it actually happened, the orders entered later. So I would refer, Your Honors, to Article V.F., as in Frank, of the plan, which — let's see if I can give Your Honor a record site. I know these are large. Well, it's in the briefs. Okay. Yes, Your Honor. So Article V.F. says — and this is a — it explains what is included within the definition of an executory contract, capital E, capital C — shall include all modifications, amendments, supplements, restatements, or other agreements. So from square one, appellants position that an amended agreement can't be an executory contract. Can you redefine Section 365 in a plan? First of all, there's a — I mean, what they point to is the preliminary definition that says that are assumable under Section 365. And then there's this additional — Right. So I think Your Honor would start by reading the two provisions in harmony, like we would any other document, even if there were ambiguity, which we don't believe there is because it says executory contract shall include, so it's defining it. But even if there were ambiguity, Judge Isger would have discretion to interpret the terms of his own plan. But it says they include these amendments, and I think it would be strange and news to a lot of the bankruptcy world — and Your Honor knows more about this than I do — to think that changing the economics of an executory contract is beyond the 365 power. But that is their position. Their position is not limited to what they call new agreements, but it includes getting a better price on your pre-petition contract as an amendment and a restructuring. They believe that cannot be — those new terms cannot be part of an executory contract. And 5A of the plan — again, and I apologize, 5F is the definition, 5A is what we call the simultaneous assumption requirement — 5A says that unless otherwise indicated or agreed by the debtors and the applicable contract counterparties, assumptions or rejections of executory contracts pursuant to the plan are effective as of the effective date, notwithstanding the fact that the deadline to object to assumption or rejection may be after the effective date. And so it is clear, and this is what Judge Isger found, that as a matter of law — and this is the necessary feature of this plan, given the substantial delay in — Well, let me tell you how I'm concerned about this post-confirmation jurisdiction. Suppose Sanchez-Mesquite was trying to undermine Carnera's position deliberately — I don't think it was, but suppose it was — and it comes and it puts these provisions in the plan, and then it basically says, we're not going to pay any attention to the secondary midstream at all. And so it just sort of cancels — if this plan worked out the way you said it did, then Carnera would have no solution here. You're saying it would have all sprung out of the plan, and therefore it's all okay. No, Your Honor, that's not our position, and this is an important feature of Judge Isger's plan. If that hypothetical — and there's no conflict between the agreements they object to and the original, but leave that aside. If there were clear conflict — let's say that we extended the primary midstream commitments by 30 years or something, which we wouldn't have done. They could have come in — and Judge Isger found this explicitly — they could have come to Judge Isger's court and objected and said — Objected when? They could have objected as late as December 21 at the hearing, and Judge Isger so found that they were at the hearing, and they could have objected. Well, I mean, is it not correct? You said these — you don't have to have approval of — told the court you don't have to have approval of these transactions? It's more nuanced than that, Your Honor. What the plan says is you don't have to go in for a 1919 settlement, but the court did have to enter an order approving — But why — you know, then — so you're saying they had to vote on the plan essentially on the come, because the plan deliberately postpones what to them, or some other party, is a very significant event in the plan, and it provides one alternative, but it doesn't provide other alternatives, and so the objecting — potentially objecting party has no idea what the endgame is going to be, and they're now barred by the plan? No, Your Honor. Let me be very — Well, that's what the court said, and that's what you argued. Respectfully, I don't think that's what Judge Isger's opinion said, and if it — and if he did, I think you could correct it and still affirm. Let me tell you why. Because Judge Isger had — this simultaneous assumption device works both ways. So if — let's say — you know, again, assume that there's some fundamental conflict between the primary midstream amendments and the GGPA, their contract. They show up in December 21st. All Carnaro needs to do is say to the bankruptcy court, how are you going to assume their contracts that would put them in simultaneous breach of mind? I'm looking at this plan provision that says everything is assumed simultaneously as of the effective date. You can't have two contracts in conflict. And Judge Isger, as he found, he would have entertained that. But let me go back. There's a factual premise embedded in your Honor's question as well, which is, how could they have known? They don't mention it in their briefs. We've mentioned it, but I want to just draw specific attention to it. In the summer of 2021, after the rejection efforts had failed, and we started negotiating with the primary midstream on a better deal for us, they sued us. This is before — this is not the case that ultimately is here. This was suit number one. They sued us in Texas state court in July 31st, 2021, and they said, they're negotiating with the primary midstream providers. That negotiating, we believe they are violating our rights. We removed that to Judge Isger's court, explaining that they're basically trying to prevent us from exercising our Section 365 powers. And Judge Isger said at a hearing, you're saying they have to reject these agreements? That seems clearly within my jurisdiction. Mr. Walshall said, no, no, no, that's not what we meant. We'd like to amend. They didn't amend. They withdrew their complaint. So the premise that they had no idea what was going on is false. They knew enough to sue us in July. Well, it doesn't matter if they know what's going on. It's all the devil's in the details. Absolutely, Your Honor. Very difficult to figure out for a person who's been away from oil and gas. Swimming in oil and gas doesn't help much, but I will say they knew enough then. But then also, in October of 2021, this is two months before this hearing, there's a status conference where they said, we've reached an agreement with the principal and principal on these agreements. They don't ask to see the agreements. They're lying in wait. And then we have the hearing, and I would point, Your Honors, to a list of attached agreements. It lists 18 midstream agreements. Seven of them are specifically designated as amended agreements. So we're in court, and they could have said, we need more time. We want to review the contracts. They could have said any of these things, and Judge Isger would have had jurisdiction to say, wait a second, to my side, he could have said, how can we have simultaneous assumption of primary midstream agreements in the GGPA if they're in conflict? And this is an important point. So let's say the shoe are on the other foot. Let's say that the primary midstream parties wanted to come in and say, after the assumptions are ordered, they could have come in and said, well, we don't like this term in the GGPA that you've agreed to as an assumed contract with Carnero. That violates my primary midstream agreement that you agreed to in December of 21. Judge Isger would have said the same thing. It's good for the goose. It's good for the gander, because the simultaneous assumption means if you have a problem between on the face of the agreement, and this, I want to come to the jurisdictional question, because I think this goes to the core. If you think that the act of assuming these two agreements as of the same day in bankruptcy court puts the two in conflict, you have to put up your hand. And so to your honors, two questions I feel like I haven't gotten to yet. One is, could they agree to expand the definition of 365? I think the short answer is absent objection, they probably could, and be bound by the plan. I think that it would be basically they waive or forfeit an objection. Do they have the authority to agree to something over an objection? I don't think so, but I don't think the court needs to get there, because they agreed to the definition of an executory contract. Well, you know, that sounds suspiciously like the agreements that parties used to reach with their typical back-scratching to exculpate the debtors, insurers, and executives, and directors from liability, and Purdue Pharma didn't like that. Yes. Yes. But that would— So how does your scenario differ from A, as to non-debtor parties, and B, as to the ability of parties to basically modify the code in a plan? Because the parties here, fundamentally different from Purdue, agreed to it. Purdue is about non-consensual releases. Excuse me, but I've held—I mean, I held a long time ago, and everybody in the Fifth Circuit and most of the bankruptcy courts, many of them ignored it, but you could not have these back-scratching agreements where you exculpated non-debtor parties in a plan, 524. You can't get around it. I don't understand. That's the way I read Purdue. Maybe I'm wrong. No, Your Honor. I think you're right, but I think that is as to a party that isn't part of the deal. So if I agree not to sue a director, a third party, in the plan, and I sign up to a plan that says, I release my claims, that's absolutely fine before, during, and after Purdue. And that is our position here, and that's what Judge Isger found this plan means. Is there any limit on what the parties can agree to in a plan with respect to the bankruptcy court's continuing future post-confirmation jurisdiction? Yes. Is there any limit, and what is it? It would be matters that, under Craig Storrs and Genon, do not affect the implementation of the plan. So I do want to— But could the parties agree that, with respect—say there's 10 parties in these midstream agreements. Could they say, we agree that the bankruptcy judge will have perpetual continuing jurisdiction over our contracts in this area? Right? So just these are parties—so whatever we negotiate, they're going to go to the bankruptcy court for approval. What would be wrong with that under your theory? Because you can't confer related to jurisdiction. We're still tethered to the text of 1334. I thought you said we could agree to a definition outside of the scope of a statutory definition of an executive contract. We're talking about two slightly different concepts, Your Honor. We could agree that such and such will be treated as an executive contract, and if nobody objects to that, the party who supports that plan is a stop from saying, this isn't an executive contract. But that's different from conferring subject matter jurisdiction that is, by definition, something that the parties can't themselves create. I agree with you on the latter legal point, but I don't understand the distinction you're trying to make. I mean, if we're going to say, Judge Isker, you get continuing jurisdiction perpetually over this concept of executive contract, it looks nothing like what the code says. Why in the world would he not be able to do that? Suppose they had said in an executive contract, we agree that everybody agrees you have to cure defaults, and we agree that the default amount is $100. But you look at the law, and it's clear, the contract is clear as day that the default amount is actually $1 million. Parties could certainly agree, we agree it's going to be $100. And it's not, in terms of stopping a party from taking a contrary position, it is not, that's not different. They're not changing the law, but it can't confer subject matter jurisdiction on a court. That's up to Congress. And to that test, in Genon, did Genon and Craig Storrs say, does it undermine a fundamental compromise of the plan? And perhaps this is what Your Honor was getting to as to what the quantum of hydrocarbons is. Yes, indeed. It is massive, Your Honor. And Judge Isger found that you can't have these molecules, this is what this lawsuit is, is the gas that's coming out of the Comanche field, which is substantially the value of this entire company, is, as their lawsuit would have it, there's a hypothetical V in the pipeline, and as they have it, it has to go both ways. It is bound by their contract to the GGPA, to them, and it is bound to go to the- How much benefit did the debtor get out of these renegotiated contracts? I don't think there's anything in the record on quantum, Your Honor, but my understanding is it's substantial. There's no way they could get out of, they have, for example, covenants running with the land with the Springfield gathering people. So until they can reach a commercial arrangement with the Springfield gathering system, they're stuck. And they couldn't, you can't renegotiate terms and get better economics. It's an important part of this company's survival was the ability to renegotiate a deal like it would be with virtually any massive executory contract. Well, I mean, that's the point. In the other case, whoever was representing the reorganized debtor or the creditor, unsecured creditor interest said that, oh, well, these HHK leases are so important, the whole value of the company turns on them. So I just wonder, how many critical points can there be? Well, Your Honor, I guess I'll reach out to- But they were a different party from you. I would say consistent with what I read in the, and Judge Oldham, your opinion recently in the Serta-Simmons case, you can't just say it and make it so, right? Saying it's important in interval doesn't make it so. But having the company's product, the hydrocarbons, owned or dedicated to two competitors, that doesn't work. You can't, this isn't one real estate lease. Who's the competitor? Oh, the, Carnero is a competitor. They are a midstream provider, a competitor of our primary midstream counterparties. Of what? Of our primary midstream counterparties. The people that we did- Yeah, of your counterparties, but not you. No, no, that's right. But they want us to send it both to Ford and to Chevy, if you will, and say, you know, what are you going to do? We couldn't afford to process, may I just briefly wrap up here? We couldn't afford to process our hydrocarbons under the original deals once. Their lawsuit says, well, notwithstanding what we agreed to in the plan, you have to pay to process them twice. And you can be in breach of these two agreements. They took their shot. It was a valid plan. They agreed to the plan. And if I can, there's one case I do want to mention, Your Honor, with your indulgence, about substantial consummation. I would refer, Your Honors, to the U.S. Brass case cited in our briefs. That was a case that had been substantially consummated, but not fully consummated. It was so substantially consummated as to have the appeal of the confirmation order deemed equitably moot. And this court held that there was related to jurisdiction. This is a core exercise of the debtor's 365 powers to renegotiate agreements and get back on their feet. When a party is exercising their core 365 power, it is a core matter under the bankruptcy court's jurisdiction. And if they didn't like that, they should have said something way earlier instead of lurking in the weeds and trying to take what is essentially a collateral attack on the bankruptcy plan and the restructuring to state court and throw this company back into chaos. The court has no further questions?  Thank you, Your Honors. Thank you, Your Honors. Going to something that Mr. Stancel said about just because you say it's true doesn't mean it is true. They don't even say that this is part of a restructuring in the Chapter 11 plan. There's no reference to this whatsoever. And also going to—I'm not sure that it's exactly the question that Your Honor asked, but with respect to, you know, what portion of this gas is the debtor's gas, this lawsuit involves the entire 100 percent of the working interest owners—working interest. Eighty-seven point five percent is non-debtor gas. So the debtor's portion of it is 12.5 percent. So that's the portion of this case that involves the actual debtor. And again, a lot of what Mr. Stancel said was talking about the post-confirmation survival and success of the reorganized debtors. And I think this Court's prior jurisprudence makes it clear that that's not enough to create a jurisdictional tether. I want to talk for a second about the stipulation, which Mr. Stancel talked a lot about. The stipulation in agreed order— Are you talking about December 21? That's correct, Your Honor. If Your Honors look specifically at the stipulation, it specifically says that it is between the parties to the stipulation. It says that at the beginning. So that is not a document. It was not purported to be binding on any other party. It states by its terms that it's between the parties to that agreement. Parties is a defined term, and my client is not a party to it. In fact, if you look at the—and I would ask the courts to look at everything related to the lead-up to that stipulation. It was uploaded without a motion less than two hours before the hearing, and counsel for the reorganized debtors stood up and said, Judge, we don't need approval for this. We can just do it because our plan gives us authority to do it. And Judge Isker even said, hey, I want to make sure that this provision doesn't bind third parties. And so we interlineated a modification to it. But the assurance was made not only because the document itself, if you look at it, is clearly as between those parties. But Judge Isker got comfortable entering it saying, hey, this is a bilateral agreement. It's not something that you're trying to bind third parties because you haven't filed the motion. Now, was it bilateral or was it multilateral? Multilateral is a better word for it, Your Honor, I apologize. But it wasn't—it didn't extend to the parties that were not actual parties to it. Well, why was your client there? My client was there because the document got uploaded and we appeared by video at the hearing, and in addition to very quickly reviewing the stipulation and seeing that it was as between the parties to the stipulation and, importantly, didn't reference any new agreements other than a passing reference to the settlement agreement, which wasn't attached. The only thing it references that—and when it talks about the concept of assumption as of the confirmation date are debtor contracts and debtor contracts that we're not suing to say that the assumption of those contracts is a violation of our rights. So you have a stipulation that by its terms says it's as between the parties. You have counsel for the debtor standing up in court on less than two hours' notice with no motion or anything suggesting that it's in any way binding on other parties saying, Judge, this is being done pursuant to the plan. Well, my client looks at the plan and says, executory contracts is defined. If they assume—as much as we didn't want them to assume those executory contracts, I'd ask the court to look at our complaint. We're not complaining about anything that was in an agreement that existed. So you look at it on its face. It's between those parties. It doesn't involve any new contracts. It doesn't ask the court—this is something that I think if you read the Appley's position, they suggest that Judge Isker approved the settlement. He did not approve the settlement. It's not attached to the stipulation. There's a passing reference to it. Judge Isker didn't approve it. And when they talk about the time leading up—and I don't think this is really relevant, but I just want to make it very clear to the court—we had been in negotiation for months trying to get the agreements so that we could see what was going on. And we were being blocked based on confidentiality. So we were not sitting on our hands. I realize that that's a factual issue, but I just want to clarify that that was not happening. We were asking— I mean, if this—I know a bunch of these documents are under seal, and if Springfield is Carnero's competitor, it would make sense that— I'm not—that's correct. I mean, I understand that the reason for confidentiality may have been that, but I'm just saying, we were trying. So, I mean, the concept, you know, when Mr. Stancil stands up and says, Carnero is sitting on his hands laying behind the log, that's not true at all. We were trying to get the agreements. And when we were presented on almost no notice with a stipulation that was as between the parties and only referenced old executory contracts, well within our right to say that doesn't affect us. And I don't—and I don't even think procedurally it could have impacted our rights because it wasn't—it wasn't—we don't believe it was pursuant to the plan. We also— Is there a transcript? Do you have any record references about this 1221 hearing, and is there a transcript? There is a transcript, Your Honor. And the transcript is in the record, and I can probably provide the Court with the specific reference to it. Well, if you can't find it immediately, you can—either party can send us a little note, a 28-J, and it's okay. I—yeah, I think I have it somewhere, Your Honor, I apologize, but it looks like my time is up. And I just thank the Courts for hearing us today and appreciate everybody's time. All right. Thank you. Thank you. On my part, I'm very grateful that we seem to have lawyers who knew something about bankruptcy arguing this appeal because it makes a big difference.